```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION

 3

   MINERVA MARTINEZ, ET AL.,          )
 4                                     )
        Plaintiffs,                    )
 5                                     )
        v.                             )  Case No. 3:22-cv-00354
 6                                     )  JUDGE RICHARDSON
                                       )
 7  NISSAN NORTH AMERICA, INC.,        )
                                       )
 8        Defendant.                   )
                                       )
 9                                     )
    -----------------------------------------------------------
10

11

12

13

14     BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE

15

                     TRANSCRIPT OF PROCEEDINGS
16                        FAIRNESS HEARING

17

                          March 20, 2023
18

19

20

21

22  -----------------------------------------------------------

23  DEBORAH K. WATSON, RPR, CRR
    Official Court Reporter
24  713 Church Street, Suite 2300
    Nashville, TN 37203
25  debbie_watson@tnmd.uscourts.gov
```

1   APPEARANCES:

2

3   For the Plaintiffs:

4               CODY R. PADGETT
                Capstone Law APC
5               1875 Century Park East, Suite 1000
                Los Angeles, CA 90067
6               (310) 556-4811
                Cody.Padgett@capstonelawyers.com

7

                NATALIE FINKELMAN BENNETT
8               Miller Shah, LLP
                1845 Walnut Street, Suite 806
9               Philadelphia, PA 19103
                (610) 891-9880
10              nfinkelman@millershah.com

11              LAWRENCE DEUTSCH
                Berger & Montague, P.C.
12              1818 Market Street, Suite 3600
                Philadelphia, PA 19103
13              (215) 875-3000
                ldeutsch@bm.net

14

                MELISSA S. WEINER
15              Pearson Warshaw, LLP
                328 Barry Avenue S., Suite 200
16              Wayzata, MN 55391
                612-389-0600
17              mweiner@pwfirm.com

18              JACOB T. CLABO
                Shackelford Bowen McKinley Norton, LLP
19              1 Music Circle South, Suite 300
                Nashville, TN 37203
20              (615) 329-4440
                jclabo@shackelford.law

21

22  ALSO PRESENT:

23              PAYAM SHAHIAN
                (Pending Motion for Admission Pro Hac Vice)

24

25

```
 1    APPEARANCES   (Continued):

 2

 3    For the Defendant, Nissan North America, Inc.:

 4              BRADLEY J. ANDREOZZI
                Faegre Drinker Biddle & Reath, LLP
 5              191 N. Wacker Dr.
                Chicago, IL 60606
 6              (312) 569-1173
                bradley.andreozzi@faegredrinker.com
 7
                E. PAUL CAULEY, JR.
 8              Faegre Drinker, Biddle & Reath, LLP
                1717 Main Street, Suite 5400
 9              Dallas, TX 75201
                (469) 357-2500
10              paul.cauley@faegredrinker.com

11              JOHN S. HICKS
                Baker, Donelson, Bearman, Caldwell &
12                Berkowitz, PC
                1600 West End Avenue, Suite 2000
13              Nashville, TN 37203
                (615) 726-5600
14              jhicks@bakerdonelson.com

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        *    *    *
 2          The above-styled cause came on to be heard at
 3      1:02 p.m. on March 20, 2023, before the Honorable Eli J.
 4      Richardson, District Judge, when the following proceedings
 5      were had, to-wit:
 6
 7          THE COURT:  All right.  We are here this afternoon
 8      in the matter of Minerva Martinez, et al, vs. Nissan North
 9      America, Inc.  And we're here for a hearing on the motions
10      that were filed in this case at Docket Nos. 48 and 50.
11          Typically this kind of thing is called a fairness
12      hearing.  It is a hearing on the motion for a settlement for
13      final -- what's described at docket -- it's really a motion
14      for this Court to approve a settlement class action, motion
15      for award of attorneys' fees.  Those are at Dockets Nos. 48
16      and 50 respectively.
17          All right.  May have to raise my voice with this
18      microphone.  It may be malfunctioning a little bit.
19          Got a few different things to talk about here
20      today, not least of which are the later filings that we had
21      in this case the end of last week, beginning of this week.
22          If counsel could make their appearances, please.
23          MR. PADGETT:  Good afternoon, Your Honor.  Cody
24      Padgett from Capstone Law for plaintiffs in the class.  With
25      me are Melissa Weiner, Natalie Finkelman Bennett, and Larry
```

1  Deutsch.

2          **THE COURT:**  All right.  Good afternoon, counsel.

3          **MR. HICKS:**  Good afternoon, Your Honor.  John

4  Hicks on behalf of Nissan North America.  Paul Cauley is

5  going to speak primarily for the defendants, so with me is

6  Brad Andreozzi, and from Nissan, Blind Akrawi.

7          **THE COURT:**  All right.  Thank you very much,

8  Mr. Hicks.  Good afternoon to folks on that side of the room

9  as well.

10          All right.  The first thing that it seems to me

11  that I should do, let's just recount a little bit of the

12  procedural history.  Last August, the Court had issued an

13  order preliminarily approving class action settlement,

14  appointing class counsel, and also directing and approving of

15  specific notice procedures.

16          As the date for the fairness hearing set by the

17  Court approached, counsel did file their motion for final

18  approval of the class action settlement at Docket No. 48,

19  also the memorandum in support of Docket No. 49, and also a

20  variety of declarations in support of those motions.

21          And then there were also filings related to

22  several objections that had been filed.  Each side filed what

23  they had styled -- I want to say maybe it was styled as

24  responses in support of the final approval, really serving to

25  sort of challenge the objections that had been made to the

1    class action settlement.

2              The Court has reviewed these filings, is familiar

3    with the final record as a whole.  And it does note that

4    there are very recent filings.  And, in particular, at

5    Docket No. 80, there were objections filed to the final

6    approval of the class action settlement.

7              And the notion behind those objections filed at

8    Docket No. 80 was there were particular class members who

9    were not really objecting to the fairness adequacy or

10   reasonableness of the settlement but, rather, were saying

11   that there should be several things done by the Court sort of

12   as a condition for the approval of the settlement.  In

13   particular, there should be the ability to opt out late after

14   the, I think it was, February 13th deadline, that there

15   should be a class notice sent out again and, this time, sent

16   out in Spanish as well, and then that -- also that there was

17   basically a request for opt-outs to be accepted late in

18   particular with respect to, but not exclusively, with respect

19   to individuals that had already had lawsuits filed against

20   the defendant in this case.

21             And the basis for these objections -- that's the

22   term used -- and the request for relief was the notion that

23   ultimately, class notice was not sufficient in a couple of

24   respects, in particular that it was not sent out -- the class

25   notice that was mailed out was not sent out in Spanish even

1  though the long form notice on the settlement website was in
2  Spanish.
3            And then there was also criticism of the notice in
4  that it did not specifically say that, well, if you have a
5  lawsuit pending, then unless you opt out, you can no longer
6  proceed with that lawsuit because the settlement will
7  determine your rights to the exclusion of your own personal
8  action.
9            So that's how the Court construed those
10  objections.  And there was filed at Docket No. 82 a variety
11  of documents in support of that request including really a
12  request to be excluded filed by a large number of folks who
13  were primarily Spanish speakers.
14            Then just this morning, at Docket No. 83,
15  defendant had filed a sort of a response to those objections
16  noting that essentially in return for sort of withdrawal of
17  the objections at Docket No. 80, that the parties would not
18  oppose an opt-out.  And as I gather, I want to hear more
19  about this opt-out of folks that did not meet the deadline,
20  and allowing them to opt out later for excusable neglect and
21  perhaps maybe setting forth the idea maybe -- and I want to
22  hear from the parties about this -- that, you know, folks
23  that are allowed to opt out late, there may be particular
24  procedures or conditions to allowing the late opt-out.
25            And then at Docket No. 84 the objecting counsel

1    withdrew its objections of the two filing objectors, who were

2    Guadalupe Martines Solano and Filomeno Estanislao Vargas.

3    And what is stated regarding the withdrawal is that class

4    counsel and NNA, which is the defendant, have agreed, based

5    on the declarations submitted by Solano and Vargas and in the

6    particular circumstances of their request that Solano and

7    Vargas should be permitted a late request to opt out or be

8    excluded from the settlement class for excusable neglect.

9          Then they say that they hereby withdraw their

10   objections to the final approval of class action settlement.

11   And they also note that neither Solano nor Vargas nor any

12   other class member represented by their counsel has been

13   offered or will receive any payment for the withdrawal of the

14   objections.

15         So probably summarized that as best I know how in

16   a short period of time.

17         So it seems to me what we need to do sort of first

18   is nail down, for the Court's understanding, the impact of

19   this withdrawal pursuant to an agreement between these

20   objectors and their counsel, on the one hand, and the parties

21   to this settlement on the other hand.

22         What the effect is -- and I suspect that there may

23   be something about the effect of this that would need to be

24   accounted for in the final approval order, which I note was

25   submitted in proposed form at Docket No. 22-2.  I don't know

1   if I've seen any other version of that, but we did have a

2   proposed final settlement order at Docket No. 22-2.

3         All right. So who wants to tell me about the

4   resolution of these objections? Mr. Padgett, Mr. Cauley?

5         **MR. CAULEY:** I think it would probably be best

6   that I address it, Your Honor.

7         **THE COURT:** Yes, sir.

8         **MR. CAULEY:** Would you like for me to do it from

9   here or from the podium?

10         **THE COURT:** Let's say the podium. Thank you.

11         **MR. CAULEY:** Your Honor, I would say that there

12   are -- we've got probably divided the group that filed late

13   opt-outs into, I would say, four groups. Okay?

14         **THE COURT:** Uh-huh.

15         **MR. CAULEY:** We have Ms. Vargas and Ms. Solano

16   that you've already addressed. We've already covered the

17   withdrawal of their objection, and both class counsel and NNA

18   have agreed that they should be considered opt-outs.

19         In addition to that, I'm going to call Group 2, I

20   think I would describe those as the group that have filed

21   late opt-out requests and had filed lawsuits by February 13

22   of 2023 which was the opt-out deadline.

23         For people that fit in that category -- and we've

24   got an agreement as to who those would be -- those should be

25   deemed to be opt-outs as well. We have worked with the

settlement administrator.  Typically, the -- assuming the Court decides to finally approve the settlement, we typically will attach an Exhibit A, which is all of the approved opt-outs.  We have already worked -- class counsel and I have already worked with the settlement administrator today to get an updated Exhibit A that would include Ms. Vargas, would include Ms. Solano, and would also include anyone that has filed a late opt-out request, but it's been filed as of today, and had a pending lawsuit on February the 13th of 2023.

And so we've already got an Exhibit A prepared and reviewed by the settlement administrator that would have all of those people in the opt-out list.

**THE COURT:**  The second category, about how many folks are we talking?

**MR. CAULEY:**  Well, we've got, I think, 55 names. Now, that's not 55 vehicles because there are some vehicles that are owned -- both people that own the vehicle submitted a separate opt-out request.  But it would be a total of 55 new names added to the opt-out list that was included with the settlement administrator's third supplemental declaration.  We've got to add 55 names to that list which we've already got and are prepared to submit to the Court later today.

**THE COURT:**  So the names, in some cases, you have

1  joint ownership, and that's why there might be more names

2  than vehicles?

3        **MR. CAULEY:**  Correct.

4        **THE COURT:**  There's a footnote in one of the

5  documents -- maybe it was the motion for final approval or

6  the brief in support of it -- though, noting that in some

7  cases, there might be one name associated with a large number

8  of vehicles as well, particularly like fleet owners.  Is that

9  right?

10        **MR. CAULEY:**  There could be, yes.

11        **THE COURT:**  Okay.  All right.  So you have a third

12  category?

13        **MR. CAULEY:**  All right.  The third and fourth

14  categories will not be on the opt-out list, but as indicated

15  in the documents we filed, Nissan North America and counsel

16  for the other individuals on the SLP client list, we have

17  reached an agreement that would be outside of final approval,

18  so it would not affect final approval.

19        It's simply an agreement that if their clients,

20  before May 20 of 2023, submit to Nissan a declaration similar

21  in content, not exactly the same -- and we've laid out the

22  parameters for that in our agreement with each other -- but

23  if they submit a declaration similar in content to Ms. Vargas

24  and Ms. Solano indicating they really cannot understand

25  English and did not know that they had received a class

1    notice, if that is submitted to us, then we have indicated we

2    will agree to treat those people as opt-outs and not enforce

3    the release in the settlement agreement in exchange for them

4    giving up the benefits of the settlement agreement.

5            So they would not get the extended warranty, they

6    would not get the other relief in the class, but they would

7    be allowed to proceed with their lawsuit or -- whether filed

8    or not.  So that would be -- I'm going to call that the

9    Spanish-speaking group for lack of a better shorthand for

10   Group 3.

11           Then Group 4 would be everybody else on the SLP

12   client list that did not fall within any of the first three

13   categories.  We have stipulated that those individuals are

14   not waiving any right they would have to file a motion for --

15   with this Court for excusable neglect if they believe there

16   are circumstances post-final approval that would be -- that

17   would warrant them filing such a motion.  And obviously, we

18   have agreed to meet and confer with SLP on those issues

19   before this Court would be troubled with any type of motion.

20           So that would -- that would -- that addresses

21   all -- I think those four groups would account for everyone,

22   and that's the agreement that we needed to tell you about so

23   you would understand that in conjunction with, you know, the

24   request for final approval, that was an agreement that we

25   have made with SLP on behalf of their clients.

1          **THE COURT:** Okay. All right. One moment.

2          All right. Now, is everyone implicated here an

3   SLP client?

4          **MR. CAULEY:** Yes. Everybody associated with the

5   motion that was filed on Thursday, those are all individuals

6   represented by strategic legal practices, SLP, based in

7   California, and their counsel is here in the audience.

8          **THE COURT:** Okay. All right. Very well. That

9   would include the 50 -- all 55 of the names in Category 2; is

10  that right?

11         **MR. CAULEY:** That is correct except for two. I

12  should have said -- that's 53 people. There were also two

13  objectors that I believe are Bennett and Cappello,

14  Ms. Bennett, Mr. Cappello. Those are objectors that really

15  intended to opt out and, after discussion with counsel, filed

16  declarations with the Court as part of, I think, the papers

17  that class counsel filed. So you add those two and the 53

18  that were represented by SLP, that's how you come up with the

19  55.

20         **THE COURT:** Okay. Gotcha. Okay. All right.

21  Because they -- you know, they were noted as filing after the

22  deadline. So 53 SLP clients in Category 2 plus Bennett and

23  Cappello who are not SLP clients, that gets you to 55.

24         **MR. CAULEY:** Right. We'll be adding 55 to the

25  opt-out list.

```
 1              THE COURT:  Okay.  All right.  So, Mr. Cauley,
 2   when we look at the proposed final approval order, what would
 3   be your suggestion about language to accommodate this?  I
 4   mean, because on -- like Category 1 and 2, maybe you don't
 5   have to say anything, just include the total of 57 folks in
 6   Exhibit A.  You don't have to say anything; fair to say?
 7              MR. CAULEY:  I would agree.
 8              THE COURT:  What about the other two categories?
 9   Anything needs to be said, or is this kind of handled outside
10   of the agreement -- I mean, the Court's final approval?
11              MR. CAULEY:  I think this is handled outside of
12   the Court's final approval order.  This is -- it is an
13   agreement, it is a separate agreement between Nissan North
14   America and SLP on behalf of their clients on what we will do
15   going forward and how their claims will be handled, but it
16   does not affect final approval, in my view.  I think it's
17   outside of this.
18              They have withdrawn; Ms. Vargas and Ms. Solano
19   have withdrawn their objection.  They're no longer asserting
20   those objections.  Obviously we would address those
21   objections on the merits.  To the extent you have questions
22   later, we're happy to do that.  But in terms of your final
23   approval order, I think, based on the fact that everything is
24   documented in -- on the docket and you've got filings from
25   Ms. Solano and Ms. Vargas, you've got filings from us, you've
```

1   got our representation that we're working with class counsel
2   to get the Exhibit A of the opt-out list complete and updated
3   to be accurate, I don't think that the -- I don't think the
4   final approval order has to do anything special that it would
5   not otherwise do.  I think it's outside the scope of this --
6   of the order here.
7            THE COURT:  Okay.  All right.  Thank you very
8   much, Mr. Cauley.  That should take care of that for now from
9   your side.
10            And, Mr. Padgett, anything that you would add to
11   what Mr. Cauley said or anything you disagree with?
12            MR. PADGETT:  No, Your Honor.  This -- I have
13   nothing to add with respect to those issues.
14            THE COURT:  All right.  Okay.  Since we have
15   counsel for SLP in the gallery, either one of them want to be
16   heard?
17            MR. CLABO:  No, Your Honor.
18            THE COURT:  All right.  Thank you.  Okay.  For the
19   record, maybe could you identify yourself, sir?
20            MR. CLABO:  Yes, Your Honor.  Jacob Clabo of the
21   Nashville Bar, and Mr. Shahian whose pro hac vice application
22   is currently pending from SLP is here as well.
23            THE COURT:  Yes, sir.  All right.  Thank you.  So
24   we'll nail down the spelling later.
25            The -- so I think I sort of understand the

```
1   resolution of those objections and, you know, the objections
2   were -- here's my view of the objections.  They were late
3   but, you know, the filing kind of -- sort of explained why,
4   and I do sort of understand that.
5           In terms of the substance of the objection, the
6   objection is being withdrawn in any event, and I think that
7   means we don't really have a -- sort of a formal objection
8   anyway for the Court to rule upon.
9           You know, having said that, what I will say about
10  the arguments made about -- made in the objection, you know,
11  I think they raise issues that are relevant to the Court's
12  sort of determination which it needs to make about ultimately
13  the adequacy of notice provided.  And I think that, you know,
14  what was in the substance of the objection doesn't show that
15  the notice provisions as ordered by the Court weren't
16  complied with.  I think the objections do a better job of
17  sort of pointing out why notice may be far from ideal for
18  particular categories of folks, you know, persons that don't
19  have English as a primary language, people that have already
20  filed an action against the defendant here.
21      And, you know, I certainly get the point there, but I'm
22  also inclined to believe -- and this goes again to the
23  determination of adequacy of notice to the class.  I
24  certainly am inclined to believe that, you know, sort of the
25  enhancements to notice, you know, additional specifics
```

translation into a particularly prominent non-English language, those things may be ideal, but the absence of them don't impair the adequacy of class notice in the final analysis.

So that's kind of where the Court's viewing that, and that's where the -- you know, and I think it's fair to say that the response by the defendant to the objection, which defendant filed as Docket No. 83, I think sets forth a basis for the Court to find that notice was adequate, notwithstanding the concerns expressed by the objectors who made the filing at Docket No. 80.

Okay. I wanted to then note that, you know, I've read the two pending motions and the documents in support. I wanted to ask Mr. Padgett to make his remarks in support of the proposed settlement.

**MR. PADGETT:** Thank you, Your Honor.

Just to start off, I want to note that I'm prepared to talk about the fairness reasonable adequacy, the factors with the exception of attorneys' fees. If Your Honor has specific questions about that, Melissa Weiner is the person to ask.

And then in terms of what you would like from me, I'm prepared to make a record and run through my points here on my outline. If you have any specific questions you'd like to ask, I'm happy to do that as well.

1     **THE COURT:** All right. Very well. Yeah, why
2 don't you walk through the points that you've highlighted for
3 discussion in your outline and we'll go from there.
4     **MR. PADGETT:** Sure. So the issue before the
5 Court, as noted, is whether the settlement is fair,
6 reasonable, and adequate. It is. Every class member
7 automatically receives a two-year, 24,000 mile extended
8 warranty on the CVT and related components, no claims
9 procedure needed.
10     That, to us, is the primary benefit of this case.
11 It is a monumental benefit to the class. Our expert, Lee
12 Bowron, supported a report and a declaration valuing that
13 component at $294 million. Past cases have noted the value
14 of extended warranties in this circuit and others, and we
15 think it's an outstanding result.
16     The release in this case was narrowly tailored.
17 It did not include any personal injury claims. It did not
18 include claims that do not relate to the component at issue
19 in this case, the CVT.
20     Notice in this case was exceptional, and the
21 response to notice was exceptional. We received 3,303
22 opt-outs, I believe. That's a miniscule percentage,
23 something like 0.07 percent. There were four objections
24 remaining after two folks declined to continue with their
25 objections because they really were trying to opt out and

1    just were misunderstanding the procedures.

2           The settlement was negotiated under the

3    supervision of an experienced mediator, Hunter Hughes.  It

4    was negotiated at arm's length, and the principal terms were

5    resolved before discussion of attorneys' fees.

6           And the settlement provides similar, if not

7    superior, remedies to those they could have expected to

8    receive at trial, but without the delay and risks associated

9    with continued litigation.

10           I just want to see if there's anything further to

11    highlight unless Your Honor has any specific questions.

12           **THE COURT:**  Well, one of the things is, you know,

13    without, you know, getting into confidential mediation stuff,

14    it would be fair to say that generally, generally, you know,

15    the compromise reached here would be sort of consistent with

16    Mr. Hughes' view or in line with -- in his view, would you

17    say that -- fair to say would have his support?

18           **MR. PADGETT:**  Yes, that is fair to say, Your

19    Honor.

20           **THE COURT:**  Fair to say, yeah.  I don't want to

21    get any more detailed than that about it, but he is -- 30

22    years ago, I was an associate working for him.  In those

23    days, his practice was exclusively employment defense, and I

24    suspect that's a fair amount of his -- probably still a fair

25    amount of his mediation.

1          But if I recall correctly, he's mediated a number

2   of these class actions in the past; is that right?

3          **MR. PADGETT:**  That's correct, Your Honor.

4          **THE COURT:**  Yeah.  Okay.

5          When we look at the objections here, in broad

6   strokes, one of the points that I think plaintiff makes in

7   response to all of these is that the remedies to the

8   grievances expressed in the objections really is simply to

9   opt out and that the remedy for such particularized

10  grievances is, you know, not to tank the settlement, simply

11  for the aggrieved person to opt out and they think they can

12  have a better remedy then to do that.  Would that be fair to

13  say?

14         **MR. PADGETT:**  That is fair to say, Your Honor.  We

15  take the objections seriously.  We reached out to everybody

16  who filed an objection because a lot of the objections

17  weren't entirely clear as to what they wanted, what -- and

18  they didn't betray an understanding of what an objection

19  really means versus what an opt-out means.  These folks are

20  new to class settlements.

21         And what we found was that most folks were either

22  just trying to opt out, or they had particular individual

23  issues that just can't be addressed in a settlement involving

24  over 2 million class members.

25         You know, one objector had an accident.  It wasn't

1    clear from the objection that the accident was caused by CVT.

2    Another was asking for incidentals like gas money for a

3    friend who had to pick them up.  And as you noted, you know,

4    if you're trying to get a recovery for things like that,

5    opting out may be the better way to do that.

6           **THE COURT:**  And, yeah, because, you know, if your

7    position is that you should do better and you should do

8    better than what you would do in the settlement, the idea is

9    to opt out because the fact that you think you could do

10   better itself doesn't go very far towards showing that a

11   proposed settlement is not fair, reasonable, and adequate.

12   Would you agree with that?

13          **MR. PADGETT:**  That's right, Your Honor.  You know,

14   these folks, they -- one had a CVT failure at 107,000 miles

15   and they wanted to extend the mileage duration to 110 miles.

16   So a lot of folks, they do not litigate these cases, they do

17   not understand the risks and the benefits.  And we submit

18   that the opinions of class counsel and defense counsel of the

19   mediator are just closer to the ground on what's realistic

20   and what's doable in a case like this.

21          **THE COURT:**  The line has to be drawn somewhere,

22   right?  Here, it's an extra 24,000 miles to two years.  But

23   it does have to be drawn somewhere.  And in your view,

24   drawing it where you did was both reasonable and, in fact,

25   impressive for the plaintiff class; is that right?

|     |                                                                       |
| --- | --------------------------------------------------------------------- |
| 1   | **MR. PADGETT:** That is correct, Your Honor.                         |
| 2   | **THE COURT:** Okay. All right. I did -- regarding                    |

1    **MR. PADGETT:** That is correct, Your Honor.

2    **THE COURT:** Okay. All right. I did -- regarding

3    notice, there were -- there were just a couple of questions

4    that I had had. I thought maybe -- let's see here. Let me

5    ask you this: Regarding the third component of relief,

6    right, it's a voucher for $1,000, is it your belief that

7    that's not an illusory benefit? And there was some briefing

8    on this. And the question, I want to ask your opinion about

9    them and I'm going to ask Mr. Cauley about this as well

10   though: It's -- is it your belief that it is not illusory in

11   the following sense, that, well, if the customer gets a

12   thousand-dollar voucher at the dealership, they're going to

13   find a way to bill that $1,000 back into the price? You know

14   what I'm saying? Right? Is your belief that the benefit for

15   that voucher is not illusory in that particular way?

16   **MR. PADGETT:** No, that's not a concern of ours.

17   This voucher is as good as cash, can be presented at the end

18   of negotiations, so it's not going to get tacked into, you

19   know, the -- that's just not a concern of ours, no.

20   **THE COURT:** Okay. Good. All right. So fair to

21   say that, you know, look, regarding the motion for attorneys'

22   fees, the cap is 3.5 million. In an earlier sort of

23   declaration, there's about 21,000 in fees. And -- excuse

24   me -- in expenses and the rest was in fees. Those expenses

25   went up, so the attorneys' fees went down so as not to exceed

1  the cap of 3.5 million.  But the idea is that the cap will be

2  reached, and attorneys' fees are going to be 3.5 million

3  minus the final figure for expenses; is that right?

4          MR. PADGETT:  That's exactly right, yes.

5          THE COURT:  Any more expenses than what I've seen

6  represented here that anyone is going to claim?

7          MR. PADGETT:  No, our last -- I'm sorry.

8          THE COURT:  I was going to say, do you think

9  that's final?

10          MR. PADGETT:  Our last submission is final.

11          THE COURT:  All right.  Now, when I look at the

12  figures -- and this kind of goes to notice -- there are a

13  million -- basically 1,002,000 class vehicles.  There were

14  2,003,000 roughly records of ownership because there can be

15  multiple owners of the same vehicle.

16          Then it says there were 1.482 roughly million

17  notices sent from those just over 2 million sets of records.

18          So you have fewer notices than you have owners.

19  The footnote here, though, sort of explains it, that one

20  notice covered a very large amount of vehicles for fleet

21  owners.  Is that -- am I reading that correctly?  I just want

22  to make sure we don't have a gap in notice.

23          MR. PADGETT:  Sure.  That factors into that

24  discrepancy.  We also received updated numbers from the

25  claims administrator here, and, you know, if folks from the

1   defense table disagree, let me know.  But what I have is that
2   notice was mailed to 1,954,169 class members at the end of
3   the day, and that they confirmed that notice reached
4   1,879,449 class members.  So I know that the claims
5   administrator has procedures for getting address bounce-back
6   and correcting those, and through that process, they were
7   able to reach approximately 96 percent of the class.
8            **THE COURT:**  Okay, 96 percent.  All right.  So
9   those are, you know -- I happen to be looking at, you know,
10  the filing and the memorandum January 12th of 2023.  It
11  sounds like your figures are definitely updated, though, by
12  several hundred thousand.  Does that sound right?  I'm
13  looking at Footnote 3.
14           **MR. PADGETT:**  That's correct, Your Honor.
15           **THE COURT:**  Okay.  All right.  You're confident we
16  don't really have a gap, really, in notice; 96 percent of
17  class members were reached?
18           **MR. PADGETT:**  That's correct.  They were reached
19  by direct mail.  There was also the settlement website.  And
20  really, as we noted in the papers, direct mail notice is a
21  phenomenal way to reach people.  It's great that we have the
22  DMV records in these cases to be able to do that.  It's
23  somewhat unusual and it does give us confidence that notice
24  was particularly effective here.
25           **THE COURT:**  Yeah.  Yeah.  Okay.  All right.  And,

1  you know, final thing is this, in broad strokes.  You've

2  touched on this in your memorandum, but fair to say that

3  obtaining class certification, if contested, and prevailing

4  at trial with any appreciable recovery would have been very,

5  very difficult, difficult hill to climb necessarily even if

6  you have a good case?  Would you agree with that?

7          **MR. PADGETT:**  I think this is a great case but

8  having done automotive defect cases for over a decade, I can

9  tell you there are a lot of challenges.  We've seen them, and

10  yes, reaching this kind of a relief through trial, there

11  would have been significant risks.

12          **THE COURT:**  Yep.  All right.  Thank you very much,

13  Mr. Padgett.

14          And, Mr. Cauley, if you wouldn't mind stepping up

15  to the plate.

16          All right.  Tell you what.  I wanted -- I did want

17  to ask about a couple of things, and you had, I'm sure, heard

18  my question about whether the thousand-dollar voucher was

19  illusory.  Dealership could find a way to offset it in how

20  they pitch the offer.  You know, maybe this time they won't

21  offer invoice price, they'll offer something higher, those

22  sorts of things.

23          What can you tell me about whether that

24  thousand-dollar voucher would be essentially as good as cash

25  for someone that does choose to purchase a new vehicle?

1      **MR. CAULEY:**  Well, I think Mr. Padgett was

2   correct.  I think the understanding of the voucher is it

3   should be treated as cash.  It is -- can be applied at the

4   end of the negotiated deal.  This is a voucher that's handed

5   to the class member, not handed to the dealer.  So the class

6   member goes into the dealer and negotiates whatever deal they

7   want to negotiate.  When it comes time to pay, they have a

8   voucher, and obviously it has to be -- it has to be an

9   officially issued and validated voucher.  But these are

10   not -- it's not like the dealers are sitting there with a

11   list, aha, we've got somebody that we can charge a thousand

12   dollars more to.  It doesn't work that way.  They get the

13   voucher and it's as good as cash.

14      **THE COURT:**  And that's especially going to be the

15   case if the class member maybe doesn't whip out the voucher

16   until the end.  But at least under that scenario, that's how

17   it's going to work.  It's going to take a thousand dollars

18   right off the purchase price that otherwise would have been

19   the case, right?

20      **MR. CAULEY:**  That's how -- yes, that's how it's

21   supposed to work.

22      **THE COURT:**  Okay.  You know, the midpoint estimate

23   of the value of the extended warranty, 294 million, is what

24   Mr. Padgett thinks, based on expert analysis.  Does it sound

25   right to you?

1          MR. CAULEY:  Well, I can't really comment on the
2    value of the warranty, but what I can comment on is, an
3    extended warranty like this is almost the perfect remedy for
4    a class.  The plaintiffs certainly advocate that there's some
5    issue with the CVTs in their vehicles, and they believe that
6    there is -- that there is a problem and an unfairness to
7    their clients.
8          Nissan doesn't see it that way.  This was a hotly
9    contested -- this is a contested case.  Nissan has a lot of
10   confidence in the CVTs, the transmissions in their vehicles.
11         We've got a disagreement here, but the extended
12   warranty almost puts the proof in the pudding.  If our
13   transmission is as good as we think it is, we'll pay less in
14   warranty costs by extending the warranty.  If it's not as
15   good as we think it is and it's closer to what the plaintiffs
16   and class counsel are saying, it will cost us more money in
17   the future because the transmission will not have performed
18   as well as we think it's going to perform.
19         But the important thing is, it takes that risk --
20   the good thing about a settlement like this is it takes that
21   risk away from the class, and we shoulder that full burden
22   because we've done an extended warranty.
23         And so in that respect, it's much more
24   advantageous to a class than, say, a settlement fund which
25   has a maximum amount, and in that case, the settlement class

1  is almost taking the risk.

2         Here, we've got all the risk ourselves, and so I

3  think that's why this does provide -- whether you put a

4  number on it or not, it provides great value to the class

5  because they're getting additional protection for their

6  transmissions for another two years or 24,000 miles.

7         THE COURT:  On that point related to the issue of

8  risk, one of the things that you had said in your response to

9  the objections was, you know, at some point the risk of a

10 problem with the transmission shifts from the manufacturer

11 and the dealer to the -- we can probably say manufacturer

12 here -- but to the purchaser.  Fair to say?

13        MR. CAULEY:  That's true, and that's how we -- you

14 know, I think that's straight contract law, yes.

15        THE COURT:  Yep.  And one of the objectors said,

16 well, my transmission didn't fail until about 107,000 miles.

17 And, in essence, you know, your response would go along the

18 lines of, you know, well, if it didn't fail to 107,000 miles,

19 that would tend to indicate in -- you know, in your case, you

20 didn't have a very good claim with respect to your vehicle

21 anyway if it lasted for 107,000 miles without a problem.

22 Right?

23        MR. CAULEY:  Certainly, that is not going to be a

24 very strong case.

25        THE COURT:  Okay.  Yeah.

1    **MR. CAULEY:**  But, you know, Your Honor, there's
2    always, in any settlement like this, you have -- you're
3    always going to have objectors that want a better deal and
4    want the better deal to be negotiated.

5         But the truth is, this deal, this warranty
6    extension, is very similar to several other warranty
7    extensions that have been approved as fair, reasonable, and
8    adequate.  Your Honor has approved previous settlements with
9    similar relief.  Judge Campbell has approved one as well.
10   And I know that before that, there was one approved in the
11   Southern District of Florida with the virtually identical
12   consideration.  And so each of those courts found it to be
13   fair, reasonable, and adequate.

14        This settlement is not materially different from
15   those.  It is very similar, and so we certainly think that
16   also should give the Court confidence that class counsel has
17   negotiated something that's fair, reasonable, and adequate
18   for the class.

19        **THE COURT:**  All right.  Then, just a couple of
20   questions about your impressions, and I won't ask you too
21   detailed about plaintiffs' counsel.  Do you see any evidence
22   of them favoring any one plaintiff over another?
23   Understanding this settlement is not really conducive to that
24   anyway, but . . .

25        **MR. CAULEY:**  Everybody pretty much gets the same

1  relief, so the class is being treated fair across the board,
2  and their own objective circumstances will dictate what they
3  actually see in terms of benefit.  But there's not one
4  class -- there's not one class being treated one way and
5  another class being treated another.

6         THE COURT:  And would you say in your experience
7  that class counsel was zealously asserting the interests of
8  the class?

9         MR. CAULEY:  Certainly from what I could see as
10  defense counsel, they have been adversaries on a number of
11  cases before.  They have been adversaries in previous Nissan
12  CVT class action settlements approved by this Court and
13  others.  We -- they certainly have not only the institutional
14  knowledge of having pursued those cases involving earlier
15  model vehicles, they certainly insisted on seeing information
16  and data about these vehicles so that they can make an
17  informed decision for the class.

18         THE COURT:  All right.  Thank you very much,
19  Mr. Cauley.  Anything else you wish to say?

20         MR. CAULEY:  Not from me.
21         I don't know if Mr. Padgett misspoke or I
22  misheard.  In my case, it's probably I misheard.  But I think
23  the number of opt-outs was just 1303 which would be in line
24  with what we have seen in other cases.

25         THE COURT:  You know, I saw -- did you get 1393?

1    At one point I saw one number and then I think I saw a 1292.

2          **MR. CAULEY:** It was 1248, but when we add the 55

3    that I've talked to you about earlier, we get to 1303. I'd

4    believe that's the number. And that is very much in line,

5    when you compare the size of this class with previous classes

6    involving the same types of settlements, that's very much in

7    line with what we would expect and certainly not lower than

8    what we would expect.

9          **THE COURT:** And I suppose that there was -- yeah,

10   I think there was a, I guess, a late filing actually that did

11   sort of address maybe a final number of opt-outs. I was

12   thinking 1292, but I guess it was 1248.

13         Does that sound right to you, Mr. Padgett?

14         **MR. PADGETT:** That's exactly right.

15         **THE COURT:** Okay. So that's kind of where we are.

16   And if we look at the percentage, you know, it's less than

17   one tenth of 1 percent.

18         **MR. CAULEY:** Less than one tenth of 1 percent and

19   we only have four objections total out of a class notice that

20   went to 1.8 to 1.9 million people, so . . .

21         **THE COURT:** Yeah. And, yeah. 1248, I think

22   that's per the third and, for that matter, the second

23   supplemental declaration of Lana Cooper regarding exclusion

24   request. So that appears to be documented in the record.

25         In terms of objections, I'll talk about those in a

1 moment, and that's certainly a very tiny figure, and the
2 Court's certainly aware of that.
3          All right.  Anything further from you, Mr. Cauley?
4          **MR. CAULEY:**  Nothing further from us, Your Honor.
5          **THE COURT:**  All right.  Thank you.
6          All right.  You know, the Sixth Circuit is sort of
7 interesting when it comes to class actions because
8 plaintiffs' counsel had focused on what the Sixth Circuit
9 case law says, the Sixth Circuit factors in approving a
10 settlement.
11          And the Sixth Circuit still uses them even though
12 for Rule 23(b)(3) settlements like this, the -- you know, the
13 Rule 23 has been amended in Rule 23(e)(2) to provide factors
14 to be considered in assessing the fairness, adequacy, and
15 reasonableness of a settlement.
16          So the Court notes that Rule 23(e)(2) states as
17 follows:  "If the proposal would bind class members, the
18 court may approve it only after a hearing and only on finding
19 that it is fair, reasonable, and adequate after considering
20 whether:  (A) the class representatives and class counsel
21 have adequately represented the class; (B) the proposal was
22 negotiated at arm's length; (C) the relief provided for the
23 class is adequate, taking into account the costs, risks, and
24 delay of trial and appeal; the effectiveness of any proposed
25 method of distributing relief to the class, including the

method of processing class-member claims; (iii), the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  That agreement has been filed of record in this case.

And "(D) the proposal treats class members equitably relative to each other."

So, you know, the standard is fair, reasonable, and adequate.  Considering those factors under the rule, the Sixth Circuit has a list of factors as follows: the value of the benefit rendered to the plaintiff class, the value of the services on an hourly basis -- and I'm sorry, removing -- this is the Sixth Circuit factors on an award of attorneys' fees which is our second issue.  And we'll return to the Sixth Circuit factors on fairness, reasonableness, and adequateness.

But while I'm at the Sixth Circuit factors for an award, the value of the benefit rendered to the plaintiffs' class, the value of the services on an hourly basis, whether the services were undertaken on a contingent fee basis, society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, the complexity of the litigation, and the professional skill and standing of counsel involved on both sides.

So that standard for attorneys' fees is, you know,

1    a Sixth Circuit-specific sort of statement of the factors.

2            The Sixth Circuit, however, it does have its own

3    set of factors, a lot of which really mirror Rule 23(a) in

4    terms of the fairness, reasonableness, and adequacy.  And,

5    you know, one of the things about the Sixth Circuit factors

6    is that they're more numerous, but they tend to encompass the

7    same thing.

8            So here are the factors in the Sixth Circuit we

9    still look at: the risk of fraud or collusion; the

10   complexity, expense, and likely duration of a litigation; the

11   amount of discovery engaged in by the parties; the likelihood

12   of success on the merits; the opinions of class counsel and

13   class representatives; the reaction of absent class members;

14   and the public interests.  The Court also must determine in

15   an A factor whether the settlement gives preferential

16   treatment to the named plaintiffs.

17           All right.  Now, I'm going to get to those

18   factors.  Let me first address the objections.  And the

19   parties really do a good job of noting that really, we have

20   four non-withdrawn objections.  Some of them have their own

21   sort of issues as to whether they were validly asserted.  For

22   example, even if they were timely, they might not have been

23   filed with the Court the way that they should have been, for

24   example, but the Court is certainly content to treat them all

25   as sort of validly filed.

1      What we have when we look at the objections, and
2  plaintiff, at Docket No. 72, kind of notes that when we look
3  at the four remaining objections, one is primarily about the
4  length of the warranty extension, either calling what was
5  negotiated inadequate or just kind of requesting something
6  more for himself.

7      Then there was a pair of objectors who asserted a
8  problem with the lack of reimbursement negotiated for
9  incidental or consequential damages or just, you know, asking
10  for such things in their own cases.  And then there was one
11  that sort of challenged the settlement eligibility
12  requirements.  You know, you don't fit within the settlement
13  class unless you meet certain criteria related to your
14  purchase and ownership.

15      And I do think, you know, these appear to be
16  laypersons, and they do seem to be confusing the inquiry here
17  regarding whether settlement is fair, reasonable, and
18  adequate.  They're sort of confusing that with the notion of
19  whether it's sort of ideal or whether they're getting
20  everything that they want and things like that.  I think
21  there is this confusion.

22      The number one response to all of these sort of
23  objections is, well, you know, be excluded from the class,
24  either opt out, or if there's a problem with the settlement
25  eligibility requirements, it excludes some people that, you

know, otherwise might be in the class, you're not going to be in the class anyway.

I wanted to -- but if you are in the settlement class, let's look at the last objection. Eric Vinson wanted the settlements mileage cap on reimbursement for repairs that would have been covered had the extended warranty been in place be expanded so that he may be compensated to $6,000.

So here, it's -- you know, that particular objection really is less to who's included in the settlement class, but it is more about, you know, second-guessing the benefits provided under the settlement agreement.

So, really, all of these objections for these four objectors, the answer is if you are in the settlement class, you can always opt out. And none of these reflects a problem with the settlement itself, that on a class-wide basis, which is what really is at issue, it's not fair, reasonable, and adequate compensation for the class. And, you know, if you want to be treated better than the class, you can always opt out.

And there is, I think, just the reality that these folks are not in a position to have the information as to the adequacy of the settlement. In other words, they don't have the information about what was -- could reasonably have been negotiated given the hurdles faced by class counsel in terms of having a class certified to begin with and prevailing at

1  trial and then getting, you know, relief that could exceed

2  what class counsel was able to negotiate.

3          So for these reasons, I'll overrule the objection.

4  I will note that I can say that no objectors have appeared

5  here in person to speak in favor of the objections, otherwise

6  I'd have afforded them that opportunity.

7          When we look at the factors here, then we'll

8  really, I think, tick through them because I think this can

9  be done pretty quickly because the analysis is not very

10  difficult.  Rule 23(e)(2), let's go through the factors.  The

11  Court finds that the class representatives and class counsel

12  have adequately represented the class.  Nothing defense

13  counsel, for example, has said, even though they're not

14  expected to be cheerleaders for opposing counsel, but nothing

15  defense counsel has said would indicate otherwise.

16          I think the record is replete with information

17  suggesting adequate effort, adequate experience, and adequate

18  results to find adequate representation.

19          There's no question that this is not a collusive

20  settlement and that the settlement was negotiated at arm's

21  length.  It involved an experienced attorney who's a

22  well-known mediator who has mediated a lot of these.  And I

23  will say from personal knowledge, 30 years ago, he was a

24  pretty esteemed attorney.  So with the help of an appropriate

25  mediator, it's clear that we were dealing with a mediated

1  negotiation that resulted in this settlement.

2  The relief provided for the class is, the Court

3  finds, adequate, considering the things I need to consider.

4  There are substantial costs, risks, and delay that

5  would be attendant upon having a trial, prevailing at trial,

6  going through the appellate process if plaintiffs' counsel

7  was to prevail at trial. You know, litigators know exactly

8  what I mean there.

9  The method of distributing relief to the class,

10  including the method of processing class member claims, here,

11  the distribution methods are pretty straightforward. If

12  you're a class member, then you get a voucher. If you have

13  reimbursable expense costs, then you can submit a claim form,

14  and then everyone, whether they submit a claim form or not,

15  who is a member of the class gets the extended warranty. And

16  extended warranties are effective things as a general matter.

17  They're very effective for consumers. The terms of the

18  proposed award of attorneys' fees appear reasonable.

19  In terms of a reasonable percentage, considering

20  the reasonable valuation of the benefits obtained for the

21  class, that percentage is certainly low. It looked to me

22  like the lodestar was a little less than half of the award

23  that we're looking at, which is a little over $3,450,000.

24  But the Court notes that, you know, the percentage of benefit

25  to the class method is ascendant and with good reason,

1    because I do think if class counsel can get good results with

2    less work, more power to them, rather than sort of churning

3    the file for no good reason to justify a larger award.

4            The Court is familiar with the terms of the

5    settlement agreement and, you know, that -- the substance of

6    that agreement is reflected throughout in the briefing, the

7    parties' substantive terms of proposed settlement, and then

8    the proposed settlement agreement.  And the proposal, with

9    the exception of sort of awards to the class representatives

10   does treat class members very equitably relative to each

11   other.

12           The first and the third categories of relief here

13   really are identical.

14           The second category, some people may have

15   reimbursable expenses, some may not.  But, you know, any

16   discrepancy between the fact that some plaintiffs may get

17   some recovery that others don't there, there's nothing

18   inequitable about that.  So if someone needed a repair to the

19   transmission and it's covered, great, more power to them.

20   And if someone didn't, then that may be just plain old good

21   news for them because they didn't have a transmission

22   problem.  So I'm not concerned with inequitable treatment.

23           Now, regarding the Sixth Circuit factors, we'll

24   tick through them quickly.  I find no risk of fraud or

25   collusion in the settlement.  And there, we're looking at

1  basically the risks that plaintiffs' counsel will negotiate a
2  good fee for themselves in return for a lower benefit to the
3  class.  That's the main thing we're looking at.  There's no
4  evidence of that, given how this was negotiated and the
5  Court's understanding that attorneys' fees were negotiated
6  after the substantive terms of class relief were agreed to.

7         Looking at the complexity, expense, and likely
8  duration of the litigation, as I said before, that supports
9  settlement as well.  There's real benefit to settling a case
10  of such complexity, and this kind of complexity, expense, and
11  duration is the kind of thing that means that it's
12  appropriate to settle cases for lesser benefits than
13  theoretically could have been obtained if counsel was able to
14  hit a home run at trial.

15         Third factor, the amount of discovery engaged in
16  by the parties.  The memorandum filed in support of this
17  talks about the efforts of plaintiffs' counsel to investigate
18  these claims and do its homework on the nature of the alleged
19  difficulties with the CVT.  I'm not sure there was a whole
20  lot of formal discovery, but there certainly was
21  investigation, and there was certainly informal discovery as
22  well that would support the award.

23         The likelihood of success on the merits, generally
24  that factor means that the less likely the success on the
25  merits, the more adequate a settlement becomes, a particular

1    settlement becomes.

2           Here, the Court realizes that the likelihood of

3    certification of the class, if opposed, and the likelihood of

4    prevailing on the merits, is not insubstantial, but everyone

5    agrees that, you know, the likelihood was debatable, and

6    that's the kind of thing that supports counsel choosing to

7    settle for real substantive relief rather than proceed in

8    hoping to get more.

9           The opinions of class counsel and class

10   representatives, they're all very much in favor of this

11   settlement, and they're the ones with experience in this

12   particular case, and class counsel are very experienced in

13   these matters regarding CVTs generally.

14          The reaction of absent class members with an

15   opt-out rate of less than 1 percent and a much, much lower

16   percentage of objectors, none of which had meritorious

17   objections anyway, suggests that this is certainly a fair,

18   reasonable, and adequate settlement.

19          Finally, the public interest does support

20   settlement because there is, you know, real relief going to a

21   large class of consumers.  That's in the public interest.

22   You know, it's an ongoing incentive for Nissan to make its

23   products as good as possible and as up to the snuff in terms

24   of consumer expectations as possible and, of course, to keep

25   our courts not bogged down in enormous class action.  The

1    public interest supports settlement of these kinds of cases.

2            Finally, the Court does find that, as discussed

3    before, there really isn't preferential treatment to the

4    named plaintiffs.  They treat it like others except to the

5    extent that each of the seven named plaintiffs would get a

6    $5,000 service award as a representative which, based on the

7    representatives -- you know, the representations of

8    plaintiffs' counsel, that award is not untoward and will be

9    approved.

10           Regarding the motion for attorneys' fees, I think

11   the -- you know, the general notion, as I've indicated, is

12   the lodestar, you know, multiplier approach.  There you'd

13   have roughly two to one.  Take the lodestar, multiply it by

14   two is kind of approximately what we're looking at here.

15   That's certainly not out of bounds for awards that have been

16   given.  And a percentage of the benefit calculation would

17   definitely suggest that this attorneys' fee award is not too

18   high.

19           In terms of the Sixth Circuit factors, I find that

20   the benefit rendered to the plaintiffs' class does look to be

21   very substantial, just one of the three components.  The

22   first one has been estimated in an estimation I don't have

23   grounds, really, to dispute even if I'm not required to

24   accept it:  294 million, the value of the services on an

25   hourly basis.  You know, here -- you know, there we're really

1   talking about the lodestar.  It's very substantial.  It's not
2   as high as close to 3.5 million, but it's well over a
3   million, if I look at the most recent estimate.
4           And the Court notes that, according to the filing
5   on March 6th, at least, there was a reference to the lodestar
6   being almost 1.6 million.
7           So then whether the services were undertaken on a
8   contingent fee basis, they were, that supports a higher award
9   because it means the plaintiffs' counsel proceeded at a risk
10  of getting nothing.
11          Society's stake in rewarding attorneys who produce
12  such benefits in order to maintain an incentive to others,
13  there certainly is a stake in bringing these kinds of suits.
14  And I say that even though, you know, I don't know if the
15  allegations of liability for the defendant are adequate or
16  not -- you know, were accurate or not.  I don't know if
17  they'd have prevailed.  I know Nissan, the defendant,
18  disputes this, but there certainly appears to be no claim
19  from the defendant that -- you know, that these claims, you
20  know, were brought in bad faith, were frivolous, couldn't
21  possibly prevail, nothing like that.
22          And so bringing these sorts of disputes on
23  products that, you know, really matter to consumers, there is
24  an incentive to doing that and doing that on a class-wide
25  basis.

1          Finally, the complexity of the litigation as

2    discussed would be high considering both the size of the

3    class and certain technical issues about the design of the

4    CVT and whether it was flawed and, if so, to what extent and

5    to what effect.

6          And finally, the skill and standing of counsel

7    involved on both sides, we have sort of very experienced and,

8    by all accounts, capable counsel on both sides which would

9    support a higher award.

10          So the Court has little trouble awarding the

11    attorneys' fees requested plus the requested costs in the

12    total amount of 3.5 million.

13          All right.  Any questions so far?  No?  All right.

14          Let's talk about the order because the Court has

15    approved both the settlement and the attorneys' fee award.

16    It's going to grant the motions at Docket No. 48 and 50.  But

17    we want to talk about what the final order of approval will

18    look like.  And as I indicated, Docket No. 22-2, I think was

19    the one version of this that I've seen.

20          What I would suggest is this, and I want to get

21    counsel's take on this: that it take the version there at

22    Docket No. 22-2, that it work together to both fill in the

23    blanks, update any information, make sure that you have a

24    thorough and complete Exhibit A which apparently will have

25    1303 names on it, and then file a consent motion for the

1    Court to enter this as the final approval order.

2           Any reason not to proceed that way, Mr. Padgett?

3           **MR. PADGETT:**  No, Your Honor.

4           **THE COURT:**  Does that sound good to you,

5    Mr. Cauley?

6           **MR. HICKS:**  It's fine with us, Your Honor.

7           **THE COURT:**  All right.

8           **MR. HICKS:**  And we'll be glad to -- if the Court

9    wishes, we'll be glad to submit a Word version but --

10          **THE COURT:**  Yeah, well, and thank you for that

11   suggestion, Mr. Hicks.  A lot of times, we do ask for that

12   because what -- what we'll see in the proposed order is

13   probably just easier for the Court to take a Word version,

14   fill in a couple of things, and get it filed.

15          Here, it may be a little -- the main difference

16   here is, I'm wondering if we shouldn't have a version with

17   the correct Exhibit A that's filed that comes from the

18   parties.  You know, there have been a preliminary Exhibit A

19   that I've seen.  I'm thinking that if we get a filing that

20   has the full Exhibit A, because there is the issue of what

21   that should look like, and we've talked about it.  We've

22   talked about what the 1303 names are and where they came

23   from.  Might -- might be good for counsel to submit that, and

24   if it turns out, for some reason, to get this thing entered,

25   it would be helpful to have a Word version, we can certainly

1   reach out for the parties.  So that's my inclination.

2          Sometimes there is language that the Court itself

3   has discussed with the parties, and would, you know, include

4   on a Word version.  Here, I really think, though, it's

5   probably just filling in some blanks and making sure we have

6   the right Exhibit A.

7          Does that make sense to you, Mr. Padgett,

8   Mr. Hicks?  Do it that way?

9          **MR. HICKS:**  Yes, Your Honor, that's good by us.

10          **MR. PADGETT:**  It does, Your Honor.

11          **THE COURT:**  All right.  Now, to be clear for the

12   record -- and, you know, there is -- there is this odd

13   dichotomy, because I'm saying I'm granting the motion and I

14   have.  Of course, you know, we all know, well, to the extent

15   the final order isn't entered, the motion hasn't been

16   "granted" granted, but I think counsel know what I mean.

17          The Court -- and maybe the way to put it is the

18   Court is indicating its intention to grant the motion, and

19   upon filing of a revised and completed version of the final

20   approval order, will grant the motion formally on the record

21   in writing.

22          All right.  Is there anything else that we need to

23   talk about at this time?  Mr. Padgett?

24          **MR. PADGETT:**  No, Your Honor.

25          **THE COURT:**  Thank you.

1          Anything further from you, Mr. Hicks?

2          **MR. HICKS:**  No, Your Honor.  Thank you.

3          **THE COURT:**  All right.  Thank you, counsel, and we

4    stand in recess.

5          (WHEREUPON, the foregoing proceedings were

6    concluded at 2:19 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    REPORTER'S CERTIFICATE

 2

 3            I, Deborah K. Watson, Official Court Reporter for

 4    the United States District Court for the Middle District of

 5    Tennessee, with offices at Nashville, do hereby certify:

 6            That I reported on the Stenograph machine the

 7    proceedings held in open court on March 20, 2023, in the

 8    matter of *UNITED STATES OF AMERICA vs. NISSAN NORTH AMERICA,*

 9    *INC.,*, Case No. 3:22-cv-00354; that said proceedings in

10    connection with the hearing were reduced to typewritten form

11    by me; and that the foregoing transcript (pages 1 through 47)

12    is a true and accurate record of said proceedings.

13            This the 7th day of May, 2023.

14

15                                /s/ Deborah K. Watson
                                  DEBORAH K. WATSON, RPR, CRR
16                                Official Court Reporter

17

18

19

20

21

22

23

24

25
```